**Opinion issued August 30, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00049-CV

———————————

## IN RE MICROVAST, INC., AND YANG WU, Relators

---

### Original Proceeding on Petition for Writ of Mandamus

---

### MEMORANDUM OPINION

Microvast, Inc. and Yang Wu petition for a writ of mandamus, challenging the trial court's order denying their motion to compel the production of privileged documents. Microvast and Wu are defendants in the underlying trial court case. Together, they assert that the plaintiff, Jeff Xu, waived his attorney-client privilege

by voluntarily disclosing legal advice that he received and by "offensive use" of the privilege.[1] We deny the petition.

## Background

Jeff Xu sued Microvast and Wu, Microvast's chief executive officer, claiming that they fraudulently induced Xu to execute a promissory note secured by shares of Microvast stock. Xu further alleges that Microvast and Wu defrauded him in connection with their demand that he return his shares of Microvast stock following his resignation from Microvast. Xu asserts that Microvast represented that the promissory note served "tax purposes" and that Microvast would not enforce it.

*Microvast's Formation*

According to the pleadings, Xu was a professor of chemistry at Xiamen University in China. Xu is an expert in fuel energy storage technology. Wu recruited Xu to start a fuel energy storage business. Xu resigned from his professorship and began working full time for what eventually became Microvast. Microvast formally incorporated in Texas in October 2006.

In December 2006, to support Xu's immigration status, Microvast provided Xu with an employment offer letter. The letter stated that Xu would be Microvast's chief technology officer. His compensation would include salary, benefits, and a

---

[1] The underlying case is *Jeff G. Xu v. Microvast, Inc. and Yang Wu*, cause number 2015-48629, pending in the 295th District Court of Harris County, Texas, the Honorable Caroline Baker presiding.

"stock option" covering "7% of company's outstanding shares and the terms will be discussed later." Xu asserts that he asked Wu for stock instead of stock options. After additional discussions, Wu and Xu agreed that Xu would own 7% of the company.

In February 2007, Wu emailed Xu a promissory note. Wu told Xu he had to sign it before Microvast could issue his stock representing 7% ownership in the company. Xu claims that Wu assured and promised that neither he nor Microvast would ever collect on the note. Xu signed the promissory note, which purported to loan Xu $770,000 secured by 15,400 shares of Microvast stock.

Xu claims that he received no loan proceeds, and that he received the stock in exchange for joining Microvast.

The note required Xu to pay $770,000 to Microvast on demand, or if no demand were made, then at the earlier of (1) 30 days after the termination of his employment or (2) December 31, 2013. The note also required Xu to pay interest on the outstanding amount. It gave Microvast a security interest in Xu's shares of Microvast stock.

The first two sentences of the pledge provision transposed the terms "Payee" and "Maker." Section 2 of the note reads:

> Security. As security for this, Payee [defined as Microvast] grants Maker [defined as Xu] a first lien security interest in and to that certain stock of Maker evidenced by that certain stock certificate(s) described on the attached Exhibit A (collectively, the "Certificate.").

This provision, which Microvast later called a "scrivener's error," purports to grant Xu a security interest in the stock, rather than Microvast.

Microvast issued Xu 15,400 common shares, which was 7% of the company's outstanding shares.

*The Relationship Ends*

In February 2011, about four years after Xu signed the promissory note, Microvast asked Xu to amend the note to correct the security provision. Xu declined to execute a modification of the note. When asked, Xu stated (among other justifications) that he had consulted with an attorney, who told him that there was no need to amend the note because the note did not provide him any protection. Microvast also asked that Xu return the stock certificate representing the 15,400 shares to Microvast to hold while the note was outstanding. Xu recorded the conversations he had with Microvast. Xu did not return the certificate. Six months later, Xu resigned.

Microvast demanded payment on the note. When Xu did not pay, Microvast sent him a notice of default, informing Xu that he could cure his default either by paying the note or by returning the shares that Microvast had issued to him. Three days after Microvast's counsel emailed the notice of default, Xu mailed his stock certificate back to Microvast, but Xu did not sign the transfer endorsement on the back of the certificate.

Microvast eventually needed its shareholders' consent to issue additional shares to two institutional investors. Because Xu owned 100 shares purchased under a stock option granted to him in 2011, his consent was necessary. In connection with requesting his consent, Microvast sent Xu a capitalization table dated May 1, 2015. The table included the 100 shares, but it did not include the 15,400 shares evidenced by the stock certificate that Xu had returned to Microvast in 2011. Xu alleges that this was the first time he had reason to know that Microvast denied Xu's ownership in the 15,400 shares. Microvast formally extinguished Xu's ownership in June 2015.

*Proceedings in the Trial Court*

Xu sued in August 2015, alleging fraudulent inducement and negligent misrepresentation in connection with his return of the stock certificate in October 2011. Microvast has pleaded limitations as an affirmative defense to Xu's claims. In response, Xu alleges discovery-rule tolling.

During discovery, Xu produced his recorded phone calls with Microvast. Microvast asserts that these conversations reveal that, more than four years before Xu filed his suit, he had conversations with his lawyer regarding the note.

Microvast requested that Xu produce his communications with this lawyer relating to the note. When Xu claimed he had no documents, Microvast subpoenaed Xu's lawyer. Xu objected, and he asserted the attorney-client privilege. Xu's lawyer refused to produce the documents in his possession. Microvast moved to compel

production of the documents. Following a hearing, the trial court denied Microvast's motion. This petition for writ of mandamus followed.

## Discussion

Microvast challenges the trial court's order, contending that Xu has waived the attorney-client privilege by voluntarily disclosing a conversation with his lawyer about the promissory note, and by offensive use. Microvast contends that Xu is affirmatively relying on his lawyer's advice in 2011 in connection with his claims against Microvast. Microvast further contends that it lacks an adequate remedy by appeal because the denied discovery "goes to the heart of [its] defense."

*Waiver Through Disclosure*

Entitled "Waiver by Voluntary Disclosure," Texas Rule of Evidence 511 establishes a general rule that "[a] person upon whom these rules confer a privilege against disclosure waives the privilege if . . . the person . . . voluntarily discloses . . . any significant part of the privileged matter unless such disclosure itself is privileged." TEX. R. EVID. 511(a)(1). Microvast asserts that Xu waived the attorney-client privilege because he "affirmatively disclosed not only that he had contacted a lawyer, but also (i) the subject matter of his discussion with the lawyer (the Note), (ii) his lawyer's mental impressions of the Note (that it was enforceable notwithstanding the scrivener's error and had strong on-demand language favoring Microvast), and (iii) details of his lawyer's advice (Xu should try to re-negotiate the

6

Note and get an employment agreement, presumably to protect him from having to pay the Note on demand)."

In refusing to amend the note, Xu told Microvast that he had talked to a lawyer who said the note appeared enforceable, that it did not offer Xu any protection, and that there was no need to amend the note to correct the scrivener's error. The trial court acted within its discretion to conclude that these disclosures (for which the privilege might be waived) did not open the door to the remainder of Xu's privileged communications with his lawyer or to the production of documents held by Xu's lawyer.

The disclosures essentially amount to three statements:

- The lawyer read the note and said that it did not provide Xu any protections, so he should try to renegotiate for more protection;

- Xu told the lawyer he did not have a written employment agreement and the lawyer said he should ask for one; and

- The note contained an error that did not "affect" the agreement and Xu did not "need" to amend the note.

Microvast does not cite any authorities suggesting that disclosures like these result in wholesale subject-matter waiver of the attorney-client privilege. Rather, the cases that Microvast advances evaluate whether the disclosure of particular documents resulted in a waiver of privilege for those documents alone. *See, e.g., Axelson, Inc. v. Mcllhany*, 798 S.W.2d 550, 553–54 (Tex. 1990) (disclosure of documents from internal investigation to FBI, IRS, and Wall Street Journal waived privilege for those

7

documents); *In re ExxonMobil Corp.*, 97 S.W.3d 353, 362–63 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding) (holding privilege waived as to specific documents). We conclude that Xu did not waive the attorney-client privilege beyond the statements themselves.

*Waiver Through Offensive Use*

Microvast further contends that the lawyer's documents are independently discoverable under the offensive use doctrine. The Texas Supreme Court has warned that "an offensive use waiver of a privilege should not lightly be found." *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex. 1993). In *Republic Insurance*, the Court concluded that "[i]n an instance in which the privilege is being used as a sword rather than a shield, the privilege may be waived." *Id*. The Court then described the limited circumstances where there may be waiver by offensive use, when the information sought would be outcome determinative of the cause of action asserted:

> First, before a waiver may be found the party asserting the privilege must seek affirmative relief. Second, the privileged information sought must be such that, if believed by the fact finder, in all probability it would be outcome determinative of the cause of action asserted. Mere relevance is insufficient. A contradiction in position without more is insufficient. The confidential communication must go to the very heart of the affirmative relief sought. Third, disclosure of the confidential communication must be the only means by which the aggrieved party may obtain the evidence. If any one of these requirements is lacking, the trial court must uphold the privilege.

*Id*.

Microvast observes that Xu is seeking affirmative relief, including money damages. It fails to cite, however, any case in which a court has held that a party waives the attorney-client privilege solely because the party seeks damages and the possibility exists that attorney-client communications undermine the claim. Microvast relies upon *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105 (Tex. 1985) to assert that:

> [Xu] cannot "invoke[] the jurisdiction of the courts in search of affirmative relief against [Microvast]; yet . . . attempt, on the basis of privilege, to deny [Microvast] the benefit of evidence which would materially weaken or defeat [his] claims against [it]."

*See id.* at 107. Although the Court in *Ginsberg* held that the trial court properly exercised its discretion in deeming plaintiff to have waived the psychotherapist-patient privilege through offensive use, it warned that its holding should not be construed as endorsing litigants to engage in "fishing expeditions" into privileged matters. *Id.* at 108. Since *Ginsberg*, the Court has made clear that offensive use waiver is limited "to instances where a party attempts to protect outcome–determinative information from any discovery." *In re M-I L.L.C.*, 505 S.W.3d 569, 579 (Tex. 2016) (citing *Ginsberg*, 686 S.W.2d at 107-08).

The Court in *Republic Insurance* refined the standard applied in *Ginsberg* by requiring that privileged information go to the heart of the affirmative relief sought to demonstrate waiver through offensive use. *See Republic Ins.*, 856 S.W.2d at 163;

*Denton v. Texas Dep't of Pub. Safety Officers Ass'n*, 862 S.W.2d 785, 789 (Tex. App.—Austin 1993, writ granted), *aff'd*, 897 S.W.2d 757 (Tex. 1995). The Court expressly held that an assertion of offensive use waiver cannot be premised on relevance or the possibility that the material would reflect a position that conflicted with the one advanced in the lawsuit. *Republic Ins.*, 856 S.W.2d at 163.

Xu discussed the note with his lawyer in February 2011. Microvast asserts that these privileged communications would reveal Xu's knowledge about his claims more than four years before he sued Microvast. Xu responds that he filed suit within three months after he discovered Microvast's position that he had surrendered his shares, and about two months after Microvast formally cancelled the shares. Xu argues that the cancellation of his shares gave rise to his action.

Microvast has not demonstrated that the communications Xu had with his lawyer in 2011 are outcome-determinative on the question of whether Xu's claims are barred by statute of limitations. Rather, Microvast seeks to review the privileged documents based on a possibility that they could reveal a position favorable to Microvast. Nor has Microvast demonstrated a limiting principle to its offensive use theory, which could open the door to the production of privileged communications any time the statute of limitations and the discovery rule are contested. Thus, the trial court acted within its discretion in denying Microvast's motion to compel.

Microvast argues that the privileged communications are needed because the potential absence of any discussion Xu had with his attorney regarding an agreement not to enforce the note could be used to cast doubt on Xu's claims with a jury. Microvast speculates that, if Xu believed that the note would not be enforced, then Xu "undoubtedly told his lawyer that when consulting him about the Note's enforceability in February 2011" and "[i]f Xu did not tell his lawyer these things when consulting the lawyer about the Note's enforceability, the jury will question his assertion of those claims here." We find this line of argument unpersuasive. Allowing discovery of privileged communications in an attempt to prove the *absence* of discussions with an attorney would open the door to every communication with an attorney without discernable limitation.

In sum, Microvast argues that the court must find offensive use waiver in this case because Xu filed a claim for damages and the privileged communications might reveal statements (or the absence of statements) that can be used to "undermine" Xu's claim that he has filed suit within the applicable statute of limitations. The Texas Supreme Court has made clear in the offensive use context, however, that the privileged information must go to "the very heart of the affirmative relief sought" in the case. *Republic Ins.*, 856 S.W.2d at 163. This means that the party asserting the privilege must place the privileged information into issue.

11

Xu does not rely on the discussion with his attorney to support his claims. Xu told Microvast that he had consulted with an attorney, but his statements do not reveal whether Xu consulted with the attorney about the claims alleged in this suit. Rather, Microvast seeks to inject Xu's disclosure of the attorney's advice into the case because it could be helpful to Microvast's limitations defense, and it poses that further discovery into the conversations Xu had with his attorney may be even more fruitful. In seeking this discovery, Microvast essentially asserts that no use of privileged communications is required for a waiver by offensive use. We reject that characterization of the rule.

**Conclusion**

For the foregoing reasons, we deny the petition for writ of mandamus.


Jane Bland
Justice


Panel consists of Justices Keyes, Bland, and Lloyd.